The Honorable Karen Overstreet
Chapter 7
Hearing Date: June 18, 2010
Hearing Time: 9:30 a.m.
Response Date: June 11, 2010

**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

In re:

STEVEN C. BATEMAN and VIRGINIA T.
LEE,

Debtor.

_____

EDMUND J. WOOD, solely in his capacity as
Chapter 7 Trustee for the Bankruptcy Estate of
Steven C. Bateman and Virginia T. Lee,

Plaintiff,

vs.

DEUTSCHE BANK NATIONAL TRUST
COMPANY as Trustee for Long Beach
Mortgage Loan Trust 2006-1; LONG BEACH
MORTGAGE COMPANY; WASHINGTON
MUTUAL BANK, as successor-in-interest to
Long Beach Mortgage Company by operation
of law and/or as its attorney in fact; JP
MORGAN CHASE BANK, N.A.; LENDER'S
PROCESSING SERVICES, INC.; PLATINUM
HOMES, INC., NORTHWEST TRUSTEE
SERVICES, INC.,

Defendants.

Case No.: 07-13346-KAO

Adversary Case No. 09-1345-KAO:

PLAINTIFF EDMUND J. WOOD'S
RESPONSE TO THE MOTION FOR
SUMMARY JUDGMENT FILED BY
DEFENDANTS DEUTSCHE BANK
NATIONAL TRUST COMPANY as
Trustee for Long Beach Mortgage Loan
Trust 2006-1 AND JP MORGAN CHASE
BANK

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

1    Comes now Plaintiff, Edmund J. Wood, solely in his capacity as Chapter 7 Trustee for

2    the Bankruptcy Estate of Steven C. Bateman and Virginia T. Lee, by and through his attorney of

3    record, Melissa A. Huelsman, Law Offices of Melissa A. Huelsman, P.S., to respond to the

4    Motion for Summary Judgment brought by Defendants DEUTSCHE BANK NATIONAL

5    TRUST COMPANY as Trustee for Long Beach Mortgage Loan Trust 2006-1 ("Deutsche") and

6    JP MORGAN CHASE ("Chase").

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 2

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

# I. <u>FACTUAL STATEMENT</u>

As this Court is well aware, the Debtors, Steven C. Bateman and Virginia T. Lee ("Debtors") entered into a mortgage loan with Defendant Platinum on or about December 2, 2005 wherein they signed a Promissory Note ("Note") payable to Defendant Platinum Homes and a Deed of Trust ("DOT"), which secured the debt evidenced in the Note with their residence, located at 3529 SW 98th Street, Seattle, Washington 98126 ("Residence"). Multiple copies of the Promissory Note have been submitted in the course of this case but the first versions presented to the Court were included in the Proof of Claim documents filed in the main case. The First Proof of Claim ("1st POC") was signed by "Moss Codilis as authorized agent for Servicer, Washington Mutual Bank", dated August 8, 2007 and include three copies of the Note. Copies of the documents Proof of Claim forms are attached to the Declaration of Melissa A. Huelsman ("Huelsman Dec.") filed concurrently herewith. On November 19, 2007 and again on March 4, 2008, a two other Proof of Claim documents were filed in the Debtors' case which were filed by Moss Codilis, and signed as "authorized agent for Servicer, Washington Mutual Bank" (hereinafter "2nd POC" and "3rd POC", respectively). No supporting documents were attached to these Proofs of Claim. *See,* Huelsman Dec.

The Debtors made their mortgage payments for a couple of years before they were forced to file for Chapter 13 bankruptcy protection on July 24, 2007. They made their plan payments to the Chapter 13 Trustee for several months but eventually fell behind and then converted to a Chapter 7 case in September 2008. Thereafter, a Motion for Relief Stay ("MFRS") was filed on January 14, 2009 by Routh Crabtree Olsen, P.S., on behalf of "Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Loan Trust 2006-1, its successors in interest, agents, assignees and/or assignors, including JP Morgan Chase Bank, National Association, as

purchaser of the loans and other assets of Washington Mutual Bank, formerly known as Washington Mutual Bank, FA as servicing agent its successors in interest, agents, assigns and assignors", which was identified as the Creditor seeking relief from the stay. A true and correct copy of the MFRS is attached to the Huelsman Dec. as Exhibit "C. The evidence in support of the MFRS was an affidavit signed by Yolanda Sbaffoni, "Doc Execution Specialist" for Defendant Chase "as purchaser of the loans and other assets of Washington Mutual Bank, formerly known as Washington Mutual Bank, FA (JP Morgan Chase Bank) the loan servicing agent for" Defendant Deutsche. Huelsman Dec.

An Assignment of the DOT from "Washington Mutual Bank, as successor-in-interest to Long Beach Mortgage Company by operation of law" was signed by Peter Read, who was really an employee of Defendant LPS, acting as "AVP of Washington Mutual" on July 11, 2007 purporting to transfer the beneficial interest to Defendant Deutsche. The document was recorded in the records of King County, Washington on April 29, 2009. The Court has already received extensive briefing about Defendant LPS' involvement with this loan and made its rulings on that subject, so Plaintiff will not re-argue those matters, but it is important to remind the Court to bear in mind the actions of Defendant LPS and its employees in manufacturing the documents in this case. A true and correct copy of this Assignment document is attached to the Huelsman Dec. as Exhibit "E". Recorded in the records of King County, Washington on April 29, 2009 was a "Lost Assignment Affidavit by Beneficiary" signed by Elizabeth Boulton, Vice Preisdent of "Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Loan Trust 2006-1 By Washington Mutual Bank, as successor-in-interest to Long Beach Mortgage Company by operation of law"signed on July 27, 2007. Huelsman Dec. Ms. Boulton asserted, wrongly, "through clerical error and oversight, the Assignment from Platinum Homes,

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN`S MOTION FOR
SUMMARY JUDGMENT - 4

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

Inc. was never recorded in the records of the County and the original document was lost subsequently thereafter (sic)." It has been made clear through deposition testimony that no one from Defendant Chase and/or Deutsche has any idea about the origination of that document and/or why it was not recorded. Further, Ms. Boulton asserts that she has personal knowledge that Defendant Deutsche has possession of the Note and that it paid "valuable consideration to Platinum Homes, Inc. to obtain possession of the Note." *See,* Deposition of Chris Hymer, a true and correct copy of which is attached was attached to the Huelsman Declaration filed in support of the Response to Motion for Summary Judgment filed by LPS as Exhibit "G".

After receiving relief from the automatic stay, Defendant Deutsche, acting as the Trustee of the trust, instructed Defendant NWT to commence a foreclosure sale, and it then created documents to facilitate that process. This involved another LPS employee, Amy Weis, signing an Appointment of Successor Trustee document in her purported capacity as a "Assistant Vice President" of Defendant WAMU. The document is dated May 23, 2003, although Defendant LPS maintains that this was just a clerical error. Huelsman Dec., Exh. G. This Assignment was recorded on April 29, 2009. During deposition, the corporate representative of Defendant LPS affirmed that its employees always receive documents and instructions from the attorney firm rather than the servicer, "virtually a hundred percent of the time". Hymer Depo., 49:24-25. This was affirmed by testimony from Defendant NWT's employee, Chris Ashcraft. A true and correct copy of the deposition testimony of Chris Ashcraft is attached to the Huelsman Dec. as Exhibit "H". This supports Plaintiff's assertions that it was Defendants NWTS and LPS who created all of the documents to obtain relief from the automatic stay and facilitate the foreclosure, instead of the actual holder of the loan, or even the servicer. Mr. Hymer confirmed this at deposition. Hymer Dep., 51:5-54:1. In fact, none of the Defendants involved in the

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

motion for relief from stay and the foreclosure actually knew who had the Promissory Note, whether it was properly endorsed nor even which version of the copies in their possession was an accurate representation of the Note. This is clear because all of these defendants presented to this Court multiple versions of the Note with the Proofs of Claim and the Motion for Relief, and then caused to be recorded documents in the records of King County, Washington which were predicated upon this supposed knowledge of the identify of the holder of the Note. Every single one of these representations was blatantly and demonstrably false, and not a single one of the Defendants cared at all whether they were truthful. They simply made the assertions that suited their purposes at the moment. Defendant LPS received a message indicating that Defendant NWTS needed documents signed, and it provided the signers. No one verified that anyone had the legal authority to do so. Hymer Dep., 89:8-94:10. As Mr. Hymer admitted in his deposition, LPS employees do not know whether the contents of any document are actually true. *Id.* Similarly, Defendant NWTS received "instructions" from a computer system and manufactured the documents necessary to complete the task, whether or not the information was accurate. Ashcraft Dep., 19:11-20:15; 24:7-32:21; 34:9-40:10; 44:15-45:1; 45:21-59:20.

During litigation, Defendants Chase and Deutsche made the "original" Note signed by the Debtors, and an Allonge available to counsel. Huelsman Dec., Exh. "I". Ms. Huelsman personally viewed the "original" document and obtained a copy from opposing counsel, however, the copy of the Note did not capture all of the permeations on the document, including two hole punches in the top center, a portion of the Note that is torn off between those holes, and the clear indication on the left corner of the Note that the document had previously been stapled with another staple that has since been removed. *Id.* There is also a handwritten notation on the front page (#697071314) that was not present in any of the previous copies of the Note provided

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 6

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

to this Court. The third page of the "original" Note is a blurry copy of the blank endorsement which is actually on the back of the second page of the Note. This endorsement is signed by two officers of any unidentified company and it is undated. *Id.*

The testimony of Mr. Pittman, the former President of Defendant Platinum, makes it clear why there is no reason to believe that the Allonge currently attached to the Note was actually signed by him, and there are numerous other questions which arise when the Court considers the manner in which the documents were handled after signing by the Debtors. A true and correct copy of the Pittman deposition transcript is attached to the Huelsman Dec. as Exhibit "J" ("Pittman Dep."). First, Mr. Pittman's testimony makes clear that Defendant Platinum did almost nothing in connection with the making of the loan. It solicited the borrowers and collected information, but almost all of the work and decision-making was done by Defendant Long Beach, as Defendant Platinum was a "correspondent" lender for that entity. Pittman Dep., 35:3-39:1. Defendant Long Beach did the underwriting and approved the loan for purchase after funding. *Id.* A company called "First Collateral Services" was the entity that provided the actual funding for the loan, and its funding of the loan was predicated upon confirmation from Long Beach that it would purchase the loan. *Id.* Defendant Platinum was identified as the "lender" on the Note and the DOT and the Note is payable to Defendant Platinum.

Mr. Pittman described with a great deal of specificity the process by which the Debtors' loan would have been made, including the signatures of the Debtors and himself, even though he had no specific recollection about this loan. Pittman Dep., 35:5-39:1; 52:2-58:3. Of particular note are the following statements by Mr. Pittman about the process:

> And then the original note -- generally, **the original note would have been shipped from the closing agent directly to our warehouse line of credit**, in this case it would have been First Collateral at that – during that year. 53:16-20

> No. **Only the note goes to First Collateral. The original other documents that**

**the borrower signed at closing went to us.**  56:12-14.

Q: . . . so the note would have gone from the escrow agent to First Collateral?
A: Right.
Q: And then once First Collateral got money from Long Beach, First Collateral would then send the promissory note to Long Beach?
A: Correct.  56:25-57:7.

Pittman Dep.  (emphasis added).

Mr. Pittman goes on testify about his purported signature on the Allonges in evidence. Pittman Dep., 58:25-60:5.  Mr. Pittman contends that he is certain that one of them is his signature.  Conveniently for the Defendants, Mr. Pittman asserts that his signature is on the version which is presently attached to the Note.  He maintained that he did not know who had signed the other Allonge on his behalf and that he had no authorized others to sign for him.  *Id.* He also confirmed that the Note and Allonge did not meet up until they arrived separately at the offices of the purchaser of the loan, in this case Defendant Long Beach.

Q: So typically, though, you just sent allonges directly to the lender who was buying the loan?
A: Right.
Q: Directly from your office?
A: Correct.

Pittman Dec., 62:12-16, Exh. 4 & 5.  Similarly, he had no idea what had happened to the other Allonge, which he asserted that he did not sign.  Pittman Dec., 62:17-19.  Mr. Pittman should also have signed the Corporate Assignment document transferring the beneficial interest in the Deed of Trust to the new owner of the loan as part of the normal process in his office.  *Id.* However, he asserted that he did not sign the Corporate Assignment which was produced by the Defendants and did not know who had signed his name nor executed the notarization asserting that he had personally signed it in front of the notary, while simultaneously asserting that the notary whose stamp was used might not have actually signed the notarization.  Pittman Dec., 62:20-75:23, Exh. 6.  What is clear from Mr. Pittman's testimony is that there is no way to

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 8

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

actually verify whether a signature on any document as his "signature" is nothing more than loops and a forgery. Further, his office staff were regularly signing documents on his behalf and falsifying notarizations and affirmations that it was his signature. *Id.*

Mr. Pittman is just not credible. He had to prove the correct spelling of his name because he has repeatedly utilized alternative spellings of his first name in documents signed under penalty of perjury and in other important legal documents which were then recorded in the public records of Washington and California. *See,* Pittman Dep., 7:11-8:14; 13:1-14:25; 77:18-86:12 and Exhibits 13 and 14. These documents include pleadings and forms in connection with Mr. Pittman's own Chapter 7 bankruptcy filing done in late 2008. *Id.*, 77:19-80:7 and Exhibit 13. In his bankruptcy case, every single pleading has his first name misspelled. *Id.* Mr. Pittman and his bankruptcy attorney included two aliases, but did not get the spelling of his name correct. *Id.* (Mr. Pittman was identified as Jeffrey A., Jeffrey Allen and Jeff Pittman on those pleadings.) He contended at deposition that he advised his bankruptcy attorney of the error and asked it to be fixed, but such contentions cannot be believed given Mr. Pittman's propensity for lots of false information. Not only was the correct spelling of his first name not listed anywhere on the pleadings, but his wife, to whom he had been married since 2001 and who signed on all of the Deeds of Trust regarding the two homes he owned, was identified as his "fiancé" in bankruptcy pleadings. *Id.*; 29:1-4, as well as Exh. 7-10, 12 and 13 to the Pittman Dep. *See also,* Schedules A, D, H and I and Paragraph 16 of the SOFA, which are attached to the Huelsman Dec. as Exhibit "K". Notably Mr. Pittman falsely asserted that he was "single" and did not report any of the household income from his wife. *Id.* His wife is not listed as a co-debtor nor is she identified as a having any obligation on the mortgage loans. *Id.* Mr. Pittman did not list his wife on Paragraph 16 of the SOFA. *Id.*

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

Further evidence of Mr. Pittman's apparent inability to tell the truth and/or to monitor the manner in which his business was operated came out during the deposition. Mr. Pittman testified that he never authorized anyone else to sign his name and that anyone who did so was acting against his wishes. Pittman Dep., 31:6-35:2; 62:20-75:24. Yet, Mr. Pittman repeatedly identified numerous documents that were recorded in the records of various counties within Washington which purported to bear his signature, including notarizations, and which he denied signing. *Id.*, including Exhibit 14. What is clear is that Mr. Pittman has a problematic relationship with the truth when it suits him and that none of his testimony verifying his purported "signature" on the Allonge document currently attached to the Note cannot be believed. There is no reason to believe that the signature on the Allonge is actually Mr. Pittman's signature at all, in spite of his affirmations. Further, Mr. Pittman's testimony about the manner in which the original Note and Allonge (even if bearing an original signature) become paired up support the assertion by the Trustee that Defendant Platinum Homes never became a "holder" at all because the Note was never in its possession it came into being - after signature by the Debtors. *Id.*

Defendants Chase and Deutsche cannot provide any testimony regarding the origination of the loan nor about the signatures on the documents, as they were not actively involved in that process. *See,* Huelsman Dec., Exh. "L" and "M", which are true and correct copies of the deposition transcripts of the corporate representatives of Defendants Chase, 6:7-7:15; 8:14-17; 12:17-15:11 and Deutsche, 58:12-59:6, respectively ("Chase Dep.") and ("Deutsche Dep."). Likewise, the corporate representatives could only guess at the reasons for all of the problems of the documentation of this loan. Ms. Baker, who provided the testimony for Defendant Chase, is nothing more than a professional witness, who was also obstructive and evasive in her testimony

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

while she was being coached by her attorney. *Id., see also,* 17:24- 23.1. Ms. Baker had no idea whether the information on the computer systems, which were taken over from WAMU by Defendant Chase, was correct and her only source of information from those computer records. Chase Dep., 23:2-26:23. However, she did report that the first time that Defendant Chase came into possession of the Note was when the "collateral wallet" was sent on December 4, 2008. *Id.*

Ms. Baker testified about the contents of the "collateral wallet" even though her only source of information was the computerized records, although she acknowledged that that file was checked because of incorrect information that had been included with the Motion for relief. *Id.*; 27:4-29:1. Ms. Baker went on to confirm that she did not know the source of any of the documents which had been filed with the Bankruptcy Court previously, except for what she was trying to surmise from the file. Chase Dep., 29:21-43:4. In particular, she could not explain how the additional copy of an Allonge was included in the electronic records. *Id.* Ms. Baker also tried to avoid answering any questions related to the actions of WAMU, but admitted that when Defendant Chase acquired the mortgage servicing business, it simply took over the computer records and facilities of WAMU and kept many of its employees. *Id.*

As for the Note itself, Ms. Baker maintained that it had moved from Defendant Deutsche to Defendant Chase in Jacksonville, and she made that assertion based upon records and nothing else. Chase Dep., 45:17-49:4. Consistent with its efforts to avoid any liability for the representations made on its behalf to this Court, Defendant Chase, through Ms. Baker and her counsel at deposition, asserted that all of the information in Ms. Sbaffoni's Affidavit was inserted by its counsel and the incorrect information about the Note was the result of, essentially, bad uploading into the LPS system. Chase Dep., 49:11-64:19. She also did not know where original documents were kept after signing but before they were sent for recording years late.

*Id.* She had no explanation for why the Corporation Assignment of Deed of Trust, purportedly signed by Mr. Pittman shortly after loan origination had disappeared, but had been scanned in electronically. 65:1-69:17. Ms. Baker also could not explain how Ms. Hindeman, who previously provided a Declaration to this Court, could provide testimony regarding loan origination, as that was handled by Long Beach. 76:1-81:12. Ms. Baker affirmed that she could not point to any records that would affirm when the allonge was affixed to the Note. *Id.,* 81:7-83:15. She also admitted that she had never before seen a file with for different versions of the same documents imaged. 86:20-21.

The testimony provided on behalf of Defendant Deutsche was slightly more illuminating, although he too is a professional witness. Deutsche Dep., 6:7-20; 20:4-22:3. He confirmed that the loans were sold to Defendant Deutsche by Long Beach and that he was part of the team which affirmed that the correct documents were received in connection with the sale, however, its efforts involve doing nothing more than making a report if something is missing. 23:5-33:24. Mr. Reyes affirmed that his job was simply to sign off on the form submitted to him regarding the loan documents and nothing more. *Id.* He affirmed that the documentation available indicates that the Note was received and there was an Allonge as well, but there is no way of knowing which Allonge was included except through his assumptions about what should have happened. 34:9-45:3; 45:4-52:11; 90:8-100:21. There are also questions about its records because he had no knowledge about how a document that was noted as being received in blank had been filled in. *Id.* (90:8- 100:21). Mr. Reyes also could not explain the reason for the multiple images of the Note in the scanned image system nor otherwise explain the missing and altered documents. *Id.*; 54:11-63:5. Mr. Reyes asserted that on December 19, 2005, Deutsche's records indicated it was going to be receiving the loan file for the first time and thereafter

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

received it. 65:22-67:5. He also confirmed that Defendant Deutsche actually does nothing with regard to the servicing or foreclosure of this loan and that everything is left up to the servicer. 70:4-74:15. Further, Defendant Deutsche maintained that it had a beneficial interest in the Debtors' DOT beginning in 2006, even though an Assignment was not executed until July 2007. *Id.* In short, the records of Defendant Deutsche do not provide clarity about the loan documents any more than the other defendants. Mr. Pittman is not credible, in the least, so we have a signature on an Allonge which cannot be reasonably verified. Even if it is verified, the Note was not anywhere near the Allonge when it was signed. The Note went to First Collateral and then on to Long Beach, and the Allonge was signed at Defendant Platinum and then shipped off to Long Beach at some unidentified location. Pittman Dep. No one knows and there are no documents which show when the Note and Allonge were paired up. Clearly the Note has been stapled and unstapled several times and no one really knows for what reason nor when it occurred. There is no credible evidence regarding the location of the other Allonge nor whether it was ever affixed to the Note. These Defendants and Mr. Pittman were engaged in document manufacturing and they got it wrong. Their employees simply created whatever documents were necessary to obtain the results that they wanted, and repeatedly affirmed under oath that they had personal knowledge of facts which were untrue and/or were completely outside the scope of their personal knowledge or even their ability to have the knowledge. They should be liable for their actions in this case and in connection with the manner in which they are conducting their business in the State of Washington.

## II. <u>ARGUMENT AND AUTHORITY</u>

A.  <u>Standard for Summary Judgment.</u>

In bringing a motion for summary judgment, the moving party bears the burden of

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 13

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

proving the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrell</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The disputed facts must be material, or they must "affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514-15, 91 L.Ed.2d 202 (1986). "The non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward withy appropriate evidence demonstrating that there is a pending dispute of material fact." <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 921 (7th Cir. 1994); <u>Keri v. Board of Trustees of Purdue Univ.</u>, 458 F.3d 620, 651 (7th Cir. 2006).

B.    <u>Defendant Chase is liable for the actions of Defendant WAMU in its role as the previous servicing agent</u>.

Defendants have asked that this Court take notice of declarations filed in another case in the United States Bankruptcy Court, Eastern District of Washington as the support for its assertion that Defendant Chase is immune from liability for the actions of Defendant WAMU, before it acquired the servicing business from the FDIC. The law of contracts makes it quite clear that the use of parol evidence is very limited and should only be admissible when there are questions about ambiguous terms, evidence of the intent of the parties outside of the contract terms themselves are inadmissible. <u>Hansen v. Lindell</u>, 14 Wn.2d 643 (1948).

> Parol evidence is generally admissible to construe a written contract and to determine the intent of the parties. <u>Berg v. Hudesman</u> , 115 Wn.2d 657 , 669-670, 801 P.2d 222 (1990). **However, parol evidence cannot add to, modify, or contradict the terms of a fully integrated contract.**

<u>Lopez v. Reynoso</u>, 129 Wn.App. 165 (2005) (emphasis added). Citation to other cases that consider other factual situations is inappropriate, because the only thing to consider here is this particular contract. Here, there can be no doubt that the contract is fully integrated and the intent of the parties is quite clear. In fact, the agreement between the FDIC, a government institution

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 14

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

and Defendant Chase, attached to the Huelsman Dec. as Exhibit "N", one of the largest banks in the world, which must have been crafted by and reviewed by an army of lawyers on each side, makes it very clear that the purchase of the servicing business of Defendant WAMU was being sold without the protection from liability that was given for the purchase of other assets, such as actual mortgage loans.  In Paragraph 2.1, titled, Liabilities Assumed by Assuming Bank, Defendant Chase agrees to

> . . .pay, perform and discharge, all of the liabilities of the Failed Bank . . . except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement . . . Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and **obligations** of the Failed Bank.

Huelsman Dec., Exh. N, ¶2.1 (emphasis added). This language is repeated in Paragraph 3.1. Section 4.8 then goes on to describe the manner in which some of the transfers would occur, but there is nothing in that paragraph which changes the plain language assertions in Paragraph 2.1 and 3.1 – Defendant Chase acquired the "servicing rights and obligations" of Defendant WAMU from the FDIC and there are no other provisions in the agreement which release Defendant Chase from liability for any of the actions of WAMU in connection with mortgage loan servicing.  This makes sense as the mortgage servicing business was not the reason for the failure of WAMU and there would not have been any legitimate reason for the FDIC to provide Defendant Chase with freedom from liability on the purchase of an unimpaired business. As the Defendants noted in their briefing, the Court in Westpark Ass'n. v. Butterfield Sav. & Loan Assoc., 60 F.3d 1452, 1459 (9th Cir. 1995) held that "[t]he FDIC also had broad powers to allocate assets and liabilities".  Here, there was not release from liability in the contract.

C.    The Pooling and Servicing Agreement makes it clear that it was formed under and must adhere to New York law, and the law of New York is clear that an allonge is only valid when it is properly affixed to the Note.

        The Pooling and Servicing Agreement entered into between Long Beach Mortgage and Defendant Deutsche ("PSA") governs the agreement between the parties relating to the

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 15

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

acquisition of the Debtors' mortgage loans and others. Page 194 of the PSA sets forth the law that governs the enforcement of the terms of the agreement and it makes clear that New York law controls. A true and correct copy of Page 194 of the PSA is attached to the Huelsman Dec. as Exhibit "O". New York's UCC § 3-202(1) states, in relevant part, that "negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order, it is negotiated by delivery with any necessary endorsement. . . ." The next subsection, UCC § 3-202(2), requires that an endorsement "be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto so as to become a part thereof." Under UCC § 3-201(3), "negotiation takes effect only when the indorsement is made and until that time there is no presumption that the transferee is the owner." <u>Consolidated Capital Corp. v. DeSalvo</u>, 146 Misc. 2d 437, 550 N.Y.S.2d 803 (N.Y. Civ. Ct. 1990).

Further, under New York law the rule is that "[W]ithout an indorsement a transferee cannot be a holder." In this case, there is no valid indorsement of the Note originating from Defendant Platinum since Mr. Pittman has not provided credible testimony. The operative section of New York's UCC (cited as CLS UCC § 3-202(2)) [1] requires indorsement on the instrument itself "or on a paper so firmly affixed thereto as to become a part thereof" in order to effectuate a valid assignment of the entire instrument."[2] The commentary to this section of New York's UCC lists as authority cases following the same proposition of law from throughout the country. These cases stand for such basic propositions as "assignment of vendor's lien note, without endorsement upon instrument itself, was not in compliance with provisions of UCC § 3-

---

[1] *See*, Uniform Commercial Code, § 3-201, subd [3]; also, Uniform Commercial Code, § 3-201, Official Comment, No. 7, p 101. as cited in <u>National Bank of North America v. Flushing Nat'l Bank</u>, 72 A.D.2d 538, 538-539 (N.Y. App. Div. 1st Dep't 1979)

[2] <u>Slutsky v Blooming Grove Inn, Inc.,</u> (1989, 2d Dept) 147 App Div 2d 208, 542 NYS2d 721.

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 16

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

202(2) or commercial practices governing such transaction."[3]  The official commentary also cites for a controlling proposition of law this holding regarding allonges "[a] document purporting to transfer and assign promissory note which was never attached to note did not serve as effective endorsement of note under UCC § 3-202(2)."[4]  A Massachusetts decision relied upon in the New York commentary held that "that payee's signing of instrument that assigned note did not constitute indorsement of note under UCC § 3-202(2) because assignment instrument was not so firmly affixed to note as to be part thereof."  Duxbury v Roberts, 388 Mass 385, 446 NE2d 401 (1983).

The Third Circuit stated "the unanimity of the courts in cases where the signature is separate from the instrument can be explained by a judicial perception that it is sound policy to require the indorsement to be on the instrument." Adams v. Madison Realty & Dev., Inc., 853 F.2d 163, 169 (3d Cir. N.J. 1988).  "The same goals prompting adoption of the provision, prevention of fraud and ensuring an attached chain of title record -- are equally served in applying the requirement here." Id.  "That longstanding provision was enacted, after all, for the benefit of parties in Empire's position, commercial sophisticates that trade in the secondary market for negotiable instruments. The provision is not ambiguous, nor can Empire assert excusable ignorance of an unusual local technicality, given the rule's universal application. The flaws in the notes should have been perceived quickly and readily cured. Instead, the record suggests that the failure to observe that Code formality was caused by nothing short of sheer carelessness." Id.  **"Financial institutions, noted for insisting on their customers' compliance with numerous ritualistic formalities, are not sympathetic petitioners in urging relaxation of an elementary business practice. It is a tenet of commercial law that "holdership and the**

---

[3] Penny v Kelley (1975, Tex Civ App 9th Dist) 528 SW2d 330, 18 UCCRS 454.

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 17

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

potential for becoming holders in due course should only be accorded to transferees that observe the historic protocol".  <u>Adams v. Madison Realty</u>, <u>supra</u> (emphasis added).  This same standard should apply here.

Lastly, as to the question of the use of an allonge at all in this case, it should be known to the Court that the State of New York has not adopted the Revised article 3 of the UCC and that the Law of New York embraces the "No-Space" test which traces its roots to an ancient case, <u>Watson's Executors v. McLaren</u>, 557, 567-568 (N.Y. Sup. Ct. 1838) where the Court held "it is a general rule that no person can be considered as a party to a bill, unless his name, or the name of the firm of which he is a partner, appear on some part of it." Again: "If there be not room on the bill, others may be added on an annexed paper called *un allonge*." This earliest statement authorizing the use of an allonge in New York law remains the law of the day in that it may be said an allonge is only proper when there is no space upon the document for the necessary indorsement sought to be entered.  Such cannot be said to be the case with this Note in this case, especially since the supposed endorser never even had the Note in his possession.  Pittman Dep.

C.     Even under Washington law, only the holder of the Promissory Note has legal authority to collect on the debt and/or to foreclose on the real property securing the debt.

The UCC, as adopted by Washington State, clearly requires that to enforce the terms of a promissory note, a person must either be the holder or a nonholder in possession with the rights of the holder.  RCW 62A.3-203.  To act as a "person" entitled to enforce a negotiable instrument under RCW 62A.3-301, that "person" must satisfy all of the prongs of the statute.  The definition of a "person entitled to enforce" under RCW 62A-3-301 is "(i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of the holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument

---

[4] Billas v Dwyer, 140 Ga App 774, 232 SE2d 102, 21 UCCRS 157 (1976).

pursuant to RCW 62A.3-309 or RCW 62A.3-418(d). None of the defendants has demonstrated that it was or is the actual holder of the Note, or the nonholder in possession, as of the date that the Motion for Relief from Stay was filed, foreclosure was initiated nor at any time during the foreclosure process. Even now, there remain significant questions regarding the validity of the signature on the Allonge currently affixed to the Note and whether it anyone can yet be the holder given that the Note was not received by Defendant Platinum after signing.

A holder of an instrument is defined in RCW 62A.2-201(20) as the person in possession if the instrument is payable to the bearer or, in the case of an instrument payable to an identified person, the identified person in possession. If the instrument is payable to an identified party other than the possessor, then the possessor is a "nonholder in possession." In the case of a nonholder in possession, it only has enforcement rights if the holder has conveyed its enforcement rights. RCW 62A.3-203. The Note in this case was made payable to Defendant Platinum but was never received by that entity after it was signed. Enforcement rights of a note can be transferred if the prongs of RCW 62A.3-203 are met. Under RCW 62A.3-203,

(a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.

(b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.

(c) Unless otherwise agreed, if an instrument is transferred for value and the transferee does not become a holder because of lack of indorsement by the transferor, the transferee has a specifically enforceable right to the unqualified indorsement of the transferor, but negotiation of the instrument does not occur until the indorsement is made.

(d) If a transferor purports to transfer less than the entire instrument, negotiation of the instrument does not occur. The transferee obtains no rights under this

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 19

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

Article and has only the rights of a partial assignee.

RCW 62A.3-203. But no such transfer occurred in this case here because the transfer was not completed by the holder. Instead, the Note was transferred after signature by the Debtors to First Collateral and then on to Defendant Long Beach, and no one can explain when it is that the Note was paired up with the Allonge, which is currently affixed. Chase Dep. and Deutsche Dep. No one of these Defendants can explain the numerous staple holes in the Note nor the tear in the top center of the document, which appears to have been the result of removing previous staples except to have current employees surmise about what occurred. *See,* Huelsman Dec. Before any entity can assert rights to enforce the Note as a nonholder in possession, it would have to prove that the Note was first transferred by someone other than the issuer.

D. The Washington Deed of Trust Act requires that the foreclosing entity and its agent, the trustee, conform exactly to the requirements of the statute in conducting a non-judicial foreclosure sale.

When the Washington Legislature enacted the Deed of Trust Act, RCW 61.24, *et seq.*, permitting non-judicial foreclosures rather than requiring lenders to file a lawsuit in order to obtain title to a residential property following default by a homeowner, they carefully crafted a process which contained "safeguards" for the homeowner and explicit requirements for conducting a foreclosure sale. RCW 61.24, *et seq.* Nowhere in the DTA is there anguage excusing the parties initiating a foreclosure from complying with its requirements.. Id. As noted by the Washington Court of Appeals in Queen City Sav. & Loan Ass'n v. Mannhalt, 111 Wn.2d 503, 760 P.2d 350 (1988), citing to 1 V. Towne, *Wash. Prac.* § 605 (2d ed. 1976), "[F]oreclosure proceedings must conform exactly to the statute." Id. at 514. "Because the deed of trust foreclosure process is conducted without review or confirmation by a court, the fiduciary duty imposed upon a trustee is exceedingly high." Cox v. Helenius, 103 Wn.2d 383, 693 P.2d

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

683 (1985).  As noted by the dissent in <u>Queen City</u>,

> Relatively unsophisticated borrowers used to be able to rely on the judiciary to prevent overreaching by lenders who make it their business to obtain every advantage from the foreclosure process.  *See,* RCW 61.12.  Since the judiciary is not involved in deed of trust foreclosures under the Act, only the words of the Act itself stand between the borrower and the lender eager to foreclose.  Unless we strictly construe the Act, that protection will erode away to zero.

<u>Queen City</u>, <u>supra</u>, at 515.

The Washington DTA has three objectives: (1) that the nonjudicial foreclosure process remains efficient and inexpensive; (2) that the process provides an adequate opportunity for interested parties to prevent wrongful foreclosure; and (3) that the process promotes the stability of land titles.  <u>Cox v. Helenius</u>, <u>supra</u>, at 387.  "Because the deed of trust foreclosure process is conducted without review or confirmation by a court, the fiduciary duty imposed on the trustee is exceedingly high."  <u>Id</u>. at 388-89.  In <u>Cox</u>, the Washington Supreme Court noted that even if the plaintiffs had not properly acted to restrain the sale, it would have nevertheless been voided because of the trustee's action.  <u>Id</u>.  The <u>Cox</u> Court noted:

> Washington courts do not require a trustee to make sure that a grantor is protecting his or her own interest. However, **a trustee of a deed of trust is a fiduciary for both the mortgagee and mortgagor and must act impartially between them.** G. Osborne, G. Nelson & D. Whitman, *Real Estate Finance Law* § 7.21 (1979).
>
> **The trustee is bound by his office to present the sale under every possible advantage to the debtor as well as to the creditor. He is bound to use not only good faith but also every requisite degree of diligence in conducting the sale and to attend equally to the interest of the debtor and creditor alike.**
>
> <u>Swindell v. Overton</u>, 310 N.C. 707, 712, 314 S.E.2d 512 (1984) (emphasis added).  *See,* <u>Blodgett v. Martsch</u>, 590 P.2d 298, 302 (Utah 1978) ("duty of trustee under a trust deed is . . . to treat the trustor fairly and in according with a high punctillo of honor"); <u>McHugh v. Church</u>, 583 P.2d 210, 213 (Alaska 1978); <u>Spires v. Edgar</u>, 513 S.W.2d 372 (Mo. 1974); <u>Whitlow v. Mountain Trust Bank</u>, 215 Va. 149, 207 S.E.2d 837 (1974); <u>Woodworth v. Redwood Empire Sav. & Loan Ass'n</u>, 22 Cal.App.3d 347, 99 Cal.Rptr. 373 (1971).

<u>Cox</u> at 389 (emphasis added).  The same standard should be applied here.

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 21

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

RCW 61.24.030(4) provides in part that a nonjudicial foreclosure cannot be held unless all of its requirements have been met. Courts universally hold nonjudicial foreclosures of deeds of trust by unauthorized persons void. 27 Cal. Jur. 3d <u>Deeds of Trust</u> § 260 (1987). <u>Hall v. Crowley</u>, 12 Cal. App. 30, 33, 106 P. 426 (1909) states the obvious:

> Numerous authorities are cited and discussed by appellants' counsel to the point that "a sale under a deed of trust by a person not authorized to act is void" – a proposition so elementary that it should be known to every student before he is admitted to practice.

<u>Id</u>. Also informative to the present case is the analytical approach of other courts in non-judicial foreclosure states to potential substantive defects in non-judicial foreclosure sales. Namely, statutes allowing foreclosure by power of sale granted in the deed of trust require strict construction against the lender. 3A N. Singer, *Statutory Construction* § 69.04 (4th ed. 1986). <u>Patton v. First Fed. Sav. & Loan Ass'n</u>, 118 Ariz. 473, 477, 578 P.2d 152 (1978) best states the reasons for this rule:

> A mortgage generally may be foreclosed only by filing a civil action while, under a Deed of Trust, the trustee holds a power of sale permitting him to sell the property out of Court with no necessity of judicial action. The Deed of Trust statutes thus strip borrowers of many of the protections available under a mortgage. Therefore, lenders must strictly comply with the Deed of Trust statutes, and the statutes and Deeds of Trust must be strictly construed in favor of the borrower.

<u>Id</u>. As this Court noted in its ruling relating to Defendant LPS' MSJ, Plaintiff has pled a claim for breach of the duties under the DTA, not for a common law claim for wrongful initiation of a foreclosure sale. In support of its position, Defendants have cited to <u>Vawter v. Quality Loan Serv.</u>, _ F.Supp.2d __, 2010 WL 1629355 (W.D. Wash. 2010) in support of their position that the Trustee cannot maintain his claims. However, as this Court well knows, the <u>Vawter</u> decision is not precedent nor binding, and it is wrong. If this Court wants to be persuaded by a non-binding decision, it should rely upon its own finding in <u>Keahey v. Jared</u>, BAP Case No.

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

WW-08-1151-PaJuKa (9th Cir., 11/3/08).  As noted by the <u>Keahey</u> Court, the DTA specifically states that the person who causes a foreclosure sale to be enjoined is, at the least, entitled to attorneys fees and costs.  <u>Keahey</u>, 21:6-18, citing to RCW 61.24.090(2), and then noted that "whenever possible, the DOTA should be interpreted in favor of the borrower."  <u>Keahey</u>, 22:9-23:11, citing to <u>Udall v. T.D. Escrow Serv., Inc.</u>, 130 P.3d 908, 911 (Wash. Ct. App. 2006), <u>rev'd on other grounds</u>, 154 P.3d 882 (Wash. 2007) and <u>Amresco v. v. SPS Props.</u>, 119 P.3d 884, 886 (Wash. Ct. App. 2005) ("Because [DOTA] removes many  protections borrowers have under a mortgage . . . courts must strictly construe [DOTA] in the borrower's favor.").  Further, there would be no point to parties utilizing the DTA from having a duty if a breach of that duty were meaningless, as the Defendants assert.  As this Court noted at previous hearings, the Legislature made clear in 2009 that former homeowners may pursue their claims even post foreclosure.  It makes no sense to allow them to pursue claims after foreclosure, but to deny them the same rights prior to the foreclosure.  RCW 61.24.127.  The Defendants maintain that there can be no harm from the initiation of a foreclosure by an entity who did not have the right to foreclose because the debt was owed, but they ignore the fact that the claims here are being made by the Trustee and that monies used to pay these Defendants might otherwise be used to pay other creditors, if, in fact, there is no right to foreclose because there is no holder.

E.    <u>FDCPA claims are not barred as to Defendant Chase.</u>

Certainly Defendant Chase (and its predecessor WAMU) were attempting to collect a debt for another, as it was the servicing agent for Defendant Deutsche. 15 U.S.C. §1692a(6).  Defendants then cite to a number of district court opinions holding that a foreclosure is not an attempt to collect a debt and therefore the FDCPA does not apply because the collector is seeking to obtain the home rather than money.  Such an argument is, frankly, preposterous as

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 23

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

foreclosure is most certainly collection of a debt. But more important even than logic is the fact that three **Circuit** courts have held precisely the opposite after engaging in a lengthy analysis about the process of a foreclosure, rather than making a summary decision as was done by all of the district courts cited by the Defendants. The Fourth Circuit in Wilson v. Draper & Goldberg, 443 F.3d 373 (4th Cir. 2006) expressly rejected the foreclosure lawyers' assertion that they were not collecting a debt as defined by the FDCPA because the action was *in rem* and noted, as is the case here, that the lawyers advised that reinstatement could occur if monies were paid. Id. at 376. Thus, the Wilson Court expressly rejects the summary decision rendered in *Heinemann,* which is the case that supported the Court's holdings in *Hulse* and subsequently in *Fong.*

The Wilson decision was rendered at approximately the same time as Kaltenbach v. Richards, 464 F.3d 524 (5th Cir. 2006). The Court in Kaltenbach did not rely upon the Wilson decision, but still reached the same conclusion – that the FDCPA did apply to attorneys and/or trustees who were attempting to collect a debt by foreclosing. The 3rd Circuit in Piper v. Portnoff Law Assocs., 396 F.3d 227, 234 (3rd Cir. 2005) reached the same conclusion and emphasized the importance of the fact that the foreclosing law firm was asking for money to reinstate the loan. Id. In the cases cited by the Defendants, it is clear that the Courts did not considered that when foreclosing, a trustee and beneficiary are concurrently making demands for money to stop the sale. The Circuit Courts expressly found that the demand for payment was debt collection activity in lieu of seizing the real property. That is exactly what occurred here, as evidenced by the Notices sent to the Debtors, consistent with the purpose of deeds of trust.

> In some jurisdictions, a deed of trust is used a security for a loan, instead of a mortgage. Under a deed of trust, legal title to the property is transferred from the property owner to a trustee to be held for the benefit of the lender, to secure repayment of the loan. **If the loan is not repaid, the lender can direct the trustee to sell the property to satisfy the outstanding debt, in accordance with the power of sale in the deed of trust and any applicable statutory provisions.**

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 24

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

National Consumer Law Center, Foreclosures (2d. ed. 2007), §4.5, citing to Milton R.

Friedman, <u>Friedman on Contracts & Conveyances of Real Prop.</u> § 6.1 (2001) (emphasis

added).[5]  If foreclosure were not debt collection, then there would be no purpose to the

provisions of the DTA which preclude any further collection activities after a foreclosure is

completed.  RCW 61.24.100(1).[6]  If the obligation disappears once title to the real property

transfers, then foreclosure is debt collection. Under the DTA, a "beneficiary" is defined as

"holder of the instrument or document evidencing the obligations secured by the deed of trust,

excluding persons holding the same as security for a different obligation."  RCW 61.24.005.

This is consistent with the UCC, Art. 3, as adopted by Washington. RCW 62A.3-203. The Court

in <u>Walcker v. Benson and McLaughlin</u>, 79 Wash.App. 739, 904 P.2d 1176 (1995) made it clear

that the Note cannot be separated from the Deed of Trust, which secures the obligation

evidenced in the Note.[7]  Thus, foreclosure is debt collection.

F.    <u>The Trustee's claims for violations of the CPA is not preempted since there is no federal
foreclosure statute and because he can prove the necessary elements.</u>

       The Consumer Protection Act ("CPA") declares unlawful "unfair or deceptive acts in the

conduct of any trade or commerce."  RCW 19.86.020.  The CPA defines "trade or commerce"

broadly, to include "sale of assets or services, and any commerce directly or indirectly affecting

the people of the state of Washington."  RCW 19.86.010(2).  The CPA expressly confirms its

---

[5] In <u>Miller v. NW Trustee Services</u>, 2005 WL 1711131 (E.D. Wash. 2005), the Court did not have the benefit of the 3rd, 4th and 5th Circuit opinions re: applicability of the FDCPA to foreclosure actions when it rendered its decision and relied solely upon <u>Heinemann</u>, <u>Hulse</u>, and another 1994 case. Similarly, when Judge Robart rendered his decision in <u>Fong v. Prof'l Foreclosure Corp.</u>, 2005 WL 3134509 (W.D. Wash. 2005), it considered only the cases of <u>Heinemann</u>, <u>Hulse</u> and a car repossession case from DE.  It did not consider the analysis in which the 3rd, 4th and 5th Circuits engaged, nor does it appear that it considered the import of the demands for payment in the foreclosure notices when determining that foreclosing on real property is not debt collection.

[6] ". . . a deficiency judgment shall not be obtained on the obligations secured by a deed of trust against any borrower, grantor, or guarantor after a trustee's sale under that deed of trust."  RCW 61.24.100(1).

[7] In that case, the Court refused to allow the beneficiary under a deed of trust to ignore the statute of limitations on enforcement of the Note and seek payment by using the non-judicial foreclosure process after the time period had passed.  <u>Walcker v. Benson and McLaughlin</u>, 79 Wash.App. 739, 904 P.2d 1176 (1995).

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 25

provisions "shall be liberally construed" to fulfill its objective of protecting the public against "unfair, deceptive, and fraudulent acts or practices." RCW 19.86.920. The CPA is subject to enforcement by the Attorney General, by other state governmental entities, and by private individuals. RCW 19.86.080, 090. A CPA claim relating to actions in connection with a foreclosure sale are **not** preempted and cannot be preempted because there are no federal foreclosure laws. Defendants cite to cases talking about preemption, but they cannot cite to a single case discussing liability relating to foreclosure for these reasons. They do not do so because none exist.

To establish a private CPA claim, the plaintiff must generally establish the following five elements: (i) that the defendant committed an unfair or deceptive act or practice; (ii) that the act or practice occurred in the scope of trade or commerce; (iii) that the act or practice affects the public interest; (iv) that the plaintiff suffered injury; and (v) that the injury was caused by the act or practice. *See,* Cashmere Valley Bank v. Brender, 116 P.3d 421 (2005); *see also*, Jeckle v. Crotty, 120 Wn. App. 374; 85 P.3d 931 (2004); Micro Enhancement Intern, Inc. v. Coopers & Lynbrand, LLP, 110 Wn. App. 412; 40 P.3d 1206 (2002). Whether a given practice is "unfair or deceptive" is a normally a question for the finder of fact. Burbo v. Harley C. Douglass, Inc., 125 Wn. App. 684; 106 P.3d 258 (2005); *see also,* Guijosa v. Wal-Mart Stores, Inc., 144 Wash.2d 907; 32 P.3d 250 (2001). Here, the Trustee maintains that these Defendants wre engaged in numerous unfair and deceptive acts in order to increase their profits and the profits of their clients, the mortgage loan servicers and the foreclosure mill attorneys, speed along the foreclosure sale and benefit the other defendants to the detriment of the Debtors and other real property owners, rather than acting in conformity with the DTA. It is preposterous for the Defendants to assert that because the Motion for Relief was filed, their actions were not

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 26

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

happening in the course of trade or commerce and that somehow making an effort to foreclose on a home to collect a debt is not part of their business operations.

The next element in a CPA claim is showing that the act occurred in the course of trade or commerce. This element generally requires some sort of commercial relationship between the defendant and the homeowner. *See,* Merchant v. Peterson, 38 Wn. App. 855, 860; 690 P.2d 1192 (1984); *see also,* Holiday Resort Community Association v. Echo Lake Associates, LLC, 135 P.3d 499, 504 (2006). However, there does not need to be privity of contract or a specific contractual relationship between the parties. Holiday Resort at 504. Here, it is clear that these Defendants engaged in the challenged wrongful acts in the course of "trade or commerce" – the servicing of a mortgage loan and the completion of a foreclosure sale under the terms of the Note and Deed of Trust. RCW 19.86.010(2).

The next element in a private CPA claim is showing that the unfair or deceptive act "impacts the public interest." Whether the practice impacts the public interest is also a question of fact, but is generally determined according to such factors as (i) whether the acts were committed in the course of the defendant's business; (ii) whether the defendant advertised to the general public; (iii) whether the defendant actively solicited the plaintiff or others; and (iv) whether the defendant occupied a superior bargaining position to the plaintiff. Cotton v. Kronenberg, 111 Wn. App. 258, 274; 44 P.3d 878 (2002). These, and potentially other relevant factors, are to be viewed in light of the context and circumstances in which the alleged unfair or deceptive practices took place. Cotton at 274. In this case, it is clear that the regular unfair and deceptive actions evidenced herein by these Defendants would have and does have an impact upon the public interest since they regularly engage in the initiation and completion of improper and illegal foreclosures against Washington state residential properties. Their actions are part of

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 27

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

a regular course of business practices which will result in wrongful foreclosures and improper

loan servicing of other individuals in this state. To be blunt – they must be stopped as it is clear

from its Motion that these Defendants assume no responsibility for its actions in executing

documents in order to facilitate foreclosures in the State of Washington.

Another more recent case of importance in determining liability under the CPA is the

Washington Supreme Court's decision in <u>Indoor Billboard v. Integra Telecom</u>, 162 Wn.2d 59;

170 P.3d 10 (2007), where the Court held that the "proximate cause" standard should be applied

to CPA claims. The Court found:

> We conclude where a defendant has engaged in an unfair or deceptive act or practice, and there has been an affirmative misrepresentation of fact, our case law establishes that there must be some demonstration of a causal link between the misrepresentation and the plaintiff's injury. Indoor Billboard urges us to adopt a per se rule and hold that payment of Integra's invoice is per se sufficient to establish the proximate cause of plaintiff's damages. We reject Indoor Billboard's per se rule because mere payment of an invoice may not establish a causal connection between the unfair or deceptive act or practice and plaintiff's damages. Proximate cause is a factual question to be decided by the trier of fact. Payment of an invoice may or may not be sufficient to establish a causal connection between the misrepresentation of fact and damages, but payment of the invoice may be considered with all other relevant evidence on the issue of proximate cause.
>
> We hold that the proximate cause standard embodied in WPI 15.01 is required to establish the causation element in a CPA claim. A plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury.

<u>Id</u>. at 84. See also, <u>Dwyer v. J.I. Kislak Mortgage Corp.</u>, 103 Wn.App. 542, 13 P.3d 240

(2000); <u>McRae v. Bolstad</u>, <u>supra</u>, 32 Wn. App. 173; <u>Mason v. Mortgage America, Inc.</u>, 114

Wn.2d 842, 792 P.2d 142 (1990)

Thus, even if this Court is convinced that these Defendants do not have separate duties to

the Debtors, it may still be liable for its actions under the CPA if those actions are a proximate

cause of some or all of the injuries suffered as a result of an unfair or deceptive practice. It is

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

telling that all of the Defendants citations on the CPA are to federal trial court decisions, none of which are binding upon this Court and which clearly demonstrate the willingness of the federal bench to deny relief to homeowners.  The Washington state courts, which are the proper arbitrars of the propriety of CPA claims, do not circumscribe the rights of Washington state residents to use the CPA to obtain relief.  The only state law citation by the Defendants is State v. Schwab, 103 Wn.2d 542, 693 P.2d 108 (1985), which talks about the Residential Landlord-Tenant Act not the DTA.  In fact, the only published decision in Washington which evaluated claims made under the CPA in relation to claims made relating to enforcement of a deed of trust is Perry v. Island Savings and Loan, 101 Wash.2d 795, 798, 684 P.2d 1281 (1984).  Although that case involved analysis of the enforceability of a due on sale clause in a Deed of Trust and not the provisions of the DTA, the Court nevertheless evaluated the CPA claims based upon whether the appellant could prove the claim.  The Perry Court did not give any indication that it was inclined to find that bringing the claim was precluded because other statutes were involved, but simply determined that the claim did not hold up under the facts of that particular case.  Id. Further, there are two unpublished Washington cases dealing with claims for violations of the CPA and the DTA where the Court chose not to hold that a claim under one statute precluded the other.  Gunsul v. Countrywide Home Loans, Inc., Wa. Ct. App. Div. I, Case No. 56071-9-I (2006) and Taylor v. Premier Mortgage Services of Washington, Inc. (2004).  See also, Glenham v. Palzer, 58 Wn.App. 294, 792 P.2d 551 (1990).

Similarly, Defendants try to make much of the fact that the Complaint in this case stating the CPA claim says only that the actions were "unfair" rather than "unfair and deceptive".  This was nothing more than a typographical error as it is clear from the specific statements made about the actions of the Defendants that Plaintiff maintains that their actions were "unfair and deceptive".  While the district court opinions which the Defendants repeatedly cite parse the language of the CPA to prevent relief to plaintiffs, no such parsing exists in state

court cases. And all of the state law cases make it very clear that the language of the statute is intended to be treated as providing a broad protection and construed liberally. Further, the argument that the Defendants have misconstrued a statute, which lead to the unfair and deceptive acts complained of here, is unsupported by the facts. <u>Leingang v. Pierce Cty. Med. Bureau, Inc.</u>, 131 Wn.2d 133, 155 (1997). Furthermore, although the CPA does not specifically authorize a court to enter other equitable remedies on behalf of individuals (such as rescinding contracts, imposing constructive trusts, etc.), the Washington Supreme Court has upheld such relief in association with CPA claims on the basis that "the superior court's inherent authority to enforce orders and fashion judgments is not dependent on the statutory grant, and as there is a need for broadened private remedies under the Consumer Protection Act." <u>Allen v. American Land Research</u>, 95 Wash. 2d 841; 631 P.2d 930 (1981).

G.    <u>The Trustee's claims are not precluded by bankruptcy law.</u>

The Defendants cite to *In re* <u>Chausse</u>, 399 B.R. 225 (9th Cir. 2008), yet they ignore the fact that the claims discussed and considered in <u>Chaussee</u> were **unsecured** claims, which are treated differently in both a Chapter 7 and a Chapter 13 case. Here, the claims at issue are secured claims and secured claims cannot be altered in a Chapter 13 bankruptcy without the filing of an adversary proceeding. FRBP 3007(b). In a Chapter 7, the trustee must first determine that there is a need to administer claims before setting a deadline for filing claims. *See,* UST Handbook for Ch. 7 Trustees. "Promptly upon determination that the administration of a case will generate funds to pay creditors, the trustee must ensure that the clerk of the bankruptcy court provides notice to creditors to file proof of claims on or before a certain date. FRBP 3002(c)(5)." Thus, no proofs of claim are filed in a Chapter 7 case unless and until the Chapter 7 Trustee determines that there are funds available, and of course, the claims must be filed by **unsecured** creditors. Unless the trustee or some other party initiates an adversary proceeding, there is no adjudication of the validity of secured claims in a Chapter 7 case.

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 30

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

Similarly, Defendants contend that these claims could have been adjudicated during the hearing on the Motion for Relief from Stay filed by Defendant WAMU. The Defendants continue to ignore the difference between a relief from stay motion and a trial which ultimately determines the rights of creditors. A relief from stay motion ONLY determines whether an alleged creditor may have relief from stay for purposes of pursuing its remedies for collection in another setting. As this Court noted very clearly at the hearing on the Defendants' Motion to Amend or Vacate the Order on Relief from Stay, that order is limited in its power and scope. If a debtor and a creditor have a dispute regarding the validity of the debt which needs to be resolved, then that matter cannot be resolved in a motion for relief from stay, but must be litigated in an adversary proceeding. 11 U.S.C. § 362.

Defendants also rely upon some of the cases cited in In re: Chausse, yet none of those cases are on point. None of these cases deal with a secured claim and each and every one of them deal with matters which are exclusively the province of the Bankruptcy Code. The Chausse case involved unsecured claims that had allegedly been purchased by a debt buyer. The case of Bassett v. Am. Gen. (In re: Bassett), 255 B.R. 747 (9th Cir. 2000) involved the propriety and enforceability of a reaffirmation agreement and order which had been entered by the Bankruptcy Court. MSR Exploraton v. Meridian Oil, 74 F.3d 910 (9th Cir. 1995) is a Chapter 11 case and disputes which occurred during the administration of that case, that resulted in the claims of malicious prosecution. The Ninth Circuit ultimately determined that any litigation relating to determinations made by the Bankruptcy Court should be litigated there. The reasoning in MSR Exploration is clear and sensible, but the Court did not make a finding that all claims under state law are precluded. Further, the claims in this case relate not only to the false and misleading motion for relief from stay filed by the Defendants herein, but to the foreclosure

sale which was also initiated and premised upon inadequate and potentially documentation.

Later in 2005, the Ninth Circuit addressed the issue again in <u>Miles v. Okun</u> (<u>In re Miles</u>), 430 F.3d 1083 (9th Cir. 2005), stating:

> We do not hold that all state actions related to bankruptcy proceedings are subject to the complete preemption doctrine. We recognize that "because the common law of the various states provides much of the legal framework for the operation of the bankruptcy system, it cannot be said that Congress has completely preempted all state regulation which may affect the actions of parties in bankruptcy court." <u>Koffman v. Osteoimplant Tech., Inc.</u>, 182 B.R. 115, 124 (D. Md. 1995). However, "remedies and sanctions for improper behavior and filings in bankruptcy court . . . are matters on which the Bankruptcy Code is far from silent and on which uniform rules are particularly important. *Id.*

<u>Miles</u>, at 1092.  <u>Miles</u> was a particular case that directly involved litigation related to the bringing of claims related to the filing of multiple involuntary bankruptcy filings.  The Court's determination that these matters were best addressed through the Bankruptcy Code because of the specific requirements of 11 U.S.C. § 303(i) does not have bearing upon the issues presented to this Court by this case.  Further, the Trustee has brought his motion to amend the complaint in order to conform to the evidence and those claims will also include violations of the Bankruptcy Code.  However, these do not preclude the bringing of other claims in equity and common law or under state law.

> The Supreme Court has historically referred to the bankruptcy courts as courts of equity. This characterization means only that the powers of a bankruptcy court include the power to grant relief that in form is equitable, such as injunctive relief.  Code § 105(a) has been liberally construed in some circuits as empowering the bankruptcy courts as courts of equity "to invoke the equitable principles to achieve fairness and justice in the reorganization process."

Norton, <u>Bankruptcy Law and Practice 3d</u>, § 4.5.

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103

### III.  CONCLUSION

For all of the above-stated reasons, Mr. Wood maintains that there are genuine issues of material fact that prevent entry of a summary judgment at this time.  Significant questions still remain regarding the loan transaction and its subsequent sales, as well as to the credibility of the testimony of Mr. Pittman and whether his signature is actually on the Allonge.

DATED this 11th day of June 2010.

LAW OFFICES OF MELISSA A. HUELSMAN, P.S.


_____/s/ Melissa A. Huelsman_____
Melissa A. Huelsman, WSBA No.30935
Attorney for Plaintiff

PLAINTIFF'S RESPONSE TO DEFS. DEUTSCHE
BANK AND JP MORGAN'S MOTION FOR
SUMMARY JUDGMENT - 33

Law Offices of Melissa A. Huelsman, P.S.
705 2nd Avenue, Suite 1050
Seattle, WA 98104
(206) 447-0103